# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**PATRICK MAHONEY,**

      **Plaintiff,**

**v.**                               **Case No: 8:23-cv-534-MSS-AAS**

**CITY OF BRADENTON,**

      **Defendant.**

_____

## ORDER

      **THIS CAUSE** comes before the Court for consideration of Defendant's Motion to Dismiss Amended Complaint, (Dkt. 17), the response in opposition thereto, (Dkt. 21), and the reply in further support of the motion to dismiss. (Dkt. 24) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **DENIES** Defendant's Motion to Dismiss.

## I.    BACKGROUND[1]

      In March 2017, Defendant City of Bradenton ("City") hired Plaintiff Patrick Mahoney ("Plaintiff" or "Mahoney") as a police officer for the Bradenton Police Department ("BPD"). (Dkt. 14 at ¶ 10) Melanie Bevan has been the Chief of the BPD since 2016. (Id. at ¶ 11) In early 2022, Mahoney began working in the Narcotics

---

[1] On a motion to dismiss, the Court assumes that the factual allegations from a plaintiff's complaint are true and, thus, relies on Plaintiff's Amended Complaint for the Factual Background section. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Division. (Id. at ¶ 14)

In February 2022, the Florida Police Benevolent Association ("PBA"), which is the union for law enforcement officers, conducted a survey for its members concerning the administration and overall morale and practices of the BPD. (Id. at ¶ 15) The PBA published the results of the survey in June 2022. (Id. at ¶ 17) The survey revealed that members had numerous issues regarding how Chief Bevan and her command staff operated the BPD. (Id. at ¶ 18) Although the survey was conducted anonymously, BPD's administration began retaliating against officers they believed took part in the survey, calling them "cowards," and going to great lengths to attempt to find out which officers responded to the survey. (Id. at ¶ 17) In the same month, Mahoney was moved from Narcotics "SafeStreets" to the Patrol Division. (Id. at ¶ 16) Mahoney was told he was being moved temporarily due to staffing issues. (Id.)

On August 15, 2022, Mahoney submitted a signed and sworn affidavit (the "Affidavit") to the Mayor of Bradenton, Gene Brown, claiming that Chief Bevan and others in command at the BPD had engaged in misfeasance, malfeasance, and gross mismanagement. (Id. at ¶¶ 20, 23) Other members of the BPD also submitted similar affidavits or letters to the Mayor. (Id. at 25) Shortly after Mahoney and other BPD members submitted their affidavits or letters, Mayor Brown called for an independent investigation into the allegations against Chief Bevan. (Id. at ¶ 22)

On February 27, 2023, Mahoney was notified that he had been placed under an Internal Affairs investigation, which began "a mere eleven days after the 'independent'

investigation into the allegations against Bevan had concluded." (Id. at ¶¶ 27-28) Mahoney was placed under investigation based on the contents of the Affidavit he submitted to the Mayor. (Id. at ¶ 27) According to Mahoney, Chief Bevan had declared she would get "vengeance" against those who submitted affidavits against her to the Mayor, but that she "ha[d] to let time pass." (Id. at ¶ 25)

On March 23, 2023, the command board reviewed the Internal Affairs' investigation findings. (Id. at ¶ 29) Bevan sat on the command review board, even though a clear conflict of interest existed because she was also the complainant. (Id. at ¶ 34) Mahoney was thereafter placed on unpaid administrative leave. (Id. at ¶ 30) He was instructed to turn over his badge and service weapon. (Id. at ¶ 30) On that same day, Mahoney was also notified that a pre-disciplinary hearing was scheduled for March 28, 2023. (Id. at ¶ 31) On March 28, 2023, Mahoney was terminated from his employment. (Id.)

On May 22, 2023, Mahoney sued the City under 42 U.S.C. § 1983, alleging that the BPD unconstitutionally retaliated against him for exercising his First Amendment rights (Count I). (Id. at ¶¶ 38-47) Mahoney also claims the City violated his rights under Florida's Public Whistleblower Act (Count II). (Id. at ¶¶ 48-55)

On June 12, 2023, the City moved to dismiss, asserting (1) that Mahoney fails to allege facts sufficient to establish that the City violated his First Amendment rights, and (2) that Mahoney fails to allege facts sufficient to establish he engaged in protected activity under the Whistleblower Act, and that he failed to comply with the

requirements of protected disclosure under the Act. (Dkt. 17) Mahoney timely opposed, (Dkt. 21), and the Court subsequently permitted the City an opportunity to file a reply. (Dkt. 24) The matter is now ripe for review.

## II.   STANDARD OF REVIEW

The threshold for surviving a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is "exceedingly low." Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A., et al, 711 F.2d 989, 995 (11th Cir. 1983). A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 560-63 (2007) (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to prove the "grounds" for his entitlement to relief, and a "formulaic recitation of the elements of a cause of action will not do." Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting Twombly, 550 U.S. at 553-556). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the court must accept the well-pleaded facts as true and construe them in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994-95. However, the court should not assume that the plaintiff can prove facts that were not alleged. Id. Thus, dismissal is warranted if, assuming the truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue that precludes

4

relief. <u>Neitzke v. Williams</u>, <u>490 U.S. 319, 326</u> (1989).

## III.    DISCUSSION

### A. Mahoney Has Pled Sufficient Facts to Establish the City Retaliated Against Him for Engaging in Protected Speech.

The City argues Plaintiff has not established that it violated Plaintiff's First Amendment rights. In order for a municipality to be subject to § 1983 liability, a plaintiff must allege facts showing: (1) his constitutional rights were violated; (2) the municipality had a custom, policy, or practice that constituted deliberate indifference to that constitutional right; and (3) the municipal custom, policy, or practice caused the constitutional violation. <u>See</u> <u>Hoffman v. Delgado</u>, No. 2:23-cv-130-SPC-NPM, 2023 U.S. Dist. LEXIS 167976 at *13 (M.D. Fla. Sept. 21, 2023). The Court addresses each ground in turn.

### i.  First Amendment Violation

As for the first prong, to state a claim of retaliation for engaging in protected speech, a public employee must allege: "(1) [his] speech is on a matter of public concern; (2) [his] First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) [his] speech played a 'substantial part' in the employer's decision to demote or discharge [him]." <u>McAlpin v. Town of Sneads</u>, 61 F.4th 916, 934 (11th Cir. 2023) (citations omitted).

Plaintiff alleges that he engaged in speech regarding matters of public concern. To determine whether Plaintiff's speech is entitled to protection, the Supreme Court has held that the "controlling factor" is whether the public employee's statements "were made pursuant to his official duties." Garcetti v. Ceballos, 547 U.S. 410, 420 (2006); Abdur-Rahman v. Walker, 567 F.3d 1278, 1282 (11th Cir. 2009). "The Court stated that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Abdur-Rahman, 567 F.3d at 1282 (quoting Garcetti, 547 U.S. at 421). "The Court defined speech made pursuant to an employee's job duties as 'speech that owes its existence to a public employee's professional responsibilities,' and a product that 'the employer itself has commissioned or created.'" Abdur-Rahman, 567 F.3d at 1282 (quoting Garcetti, 547 U.S. at 421-22).

Further, speech is "of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." Gwinnett v. Sw. Fla. Reg'l Planning Council, 407 F. Supp. 3d 1273, 1277 (M.D. Fla. Sept. 16, 2019) (quoting Lane v. Franks, 573 U.S. 228, 241 (2014) (internal quotation marks and citation omitted)). "The speech must be on 'a subject of general interest and of value and concern to the public.'" Gwinnett, 407 F. Supp. 3d at 1277 (quoting Lane, 573 U.S. at 241). This "inquiry turns on the 'content, form, and context' of the speech." Gwinnett, 407 F. Supp. 3d at 1277

(quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). Ultimately, "[w]hether speech is of public concern is a question of law for courts to resolve." Gwinnett, 407 F. Supp. 3d at 1277 (quoting Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1159 (11th Cir. 2015)).

Here, when construed in the light most favorable to Plaintiff, Plaintiff's Amended Complaint plausibly alleges that his speech was made as a citizen on a matter of public concern. Specifically, Plaintiff alleges his "Affidavit was protected speech, as [he] authored and signed the affidavit which implicated matters of public concern, namely misfeasance, malfeasance, and/or gross mismanagement by Chief Bevan and others in command at the BPD." (Dkt. 14 at ¶ 23; Dkt. 14-1 at 9-15) Unlike the employee in Garcetti, Plaintiff did not write the Affidavit in order to fulfill his job duties, nor does Plaintiff allege as such. See Garcetti, 547 U.S. at 421 (noting that the employee did "not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor.'"); see also Abdur-Rahman, 567 F.3d at 1283 ("[T]he reports of the inspectors to their supervisors about sewer overflows they were required to investigate are not protected under the First Amendment" because the reports "owe their existence . . . to their official responsibilities and cannot reasonably be divorced from those responsibilities.")

Plaintiff's Affidavit clearly relays incidents of misfeasance, malfeasance, and/or gross mismanagement by Chief Bevan and others in command. (Dkt. 14-1 at 9-15). The Affidavit does not "owe its existence to [Plaintiff's] professional responsibilities."

Abdur-Rahman, 567 F.3d at 1282. And the Affidavit was not a product "'the employer itself has commissioned or created.'" Id. Plaintiff engaged in speech regarding matters of "social, or other concern to the community," or, potentially, "a subject of legitimate news interest." Gwinnett, 407 F. Supp. 3d at 1277. At this stage of the case, the Court finds that Plaintiff's Affidavit raised matters of public concern. See Garcetti, 547 U. S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance").

In addition, the City does not contend that Plaintiff was not a citizen when he raised matters of public concern in his Affidavit. (See Dkts. 17, 24) In any event, the Court notes that, even though Plaintiff learned of the BPD's alleged misconduct in his role as a police officer and raised these allegations to the Mayor (as opposed to the public), Plaintiff did not raise the allegations of misconduct pursuant to his role as an employee of the City.

In Perez v. City of Opa-Locka, the City of Opa-Locka argued that the plaintiff Police Captain failed to establish a First Amendment violation because he complained about the alleged improper use of City funds in his capacity as a City police officer and not as a citizen. 629 F. Supp. 3d 1164, 1181 (S.D. Fla. Sept. 14, 2022). The City of Opa-Locka claimed that since the Captain only complained about the financial waste to the Police Chief (as opposed to the City Commission or the press), he had complained about the financial waste in his role and job duties as a City police officer. Id. The court rejected that argument, finding (1) that the plaintiff adequately alleged

that the use or misuse of public funding by a municipality and its agencies constituted a matter of public concern and (2) that the plaintiff had not alleged his duties as a police captain included budgeting or financial management. Id. at 1182. The court, relying on precedent from the Eleventh Circuit, further found that the fact the plaintiff "did not go to the press or the City Commission [was] relevant, but not dispositive." Id. at 1182-83 (citing Alves, 804 F.3d at 1162) ("[W]hether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive."). The court stated it was "not persuaded that Plaintiff's failure to go to the City Commission or the Press [was] particularly significant" in this case because "Plaintiff voiced his concern to the individual alleged to be responsible for the Police Department's expenditures and budgeting – the Chief of Police." Perez, 629 F. Supp. 3d at 1183. Furthermore, there were no allegations that the plaintiff "complained of the City's financial mismanagement to further his own private interests." Id. (first citing Alves, 804 F.3d at 1162 (recognizing that the inquiry is whether "the employee spoke on a matter of public concern or on matters of only personal interest"); and then citing Boyce v. Andrew, 510 F.3d 1333, 1342 (11th Cir. 2007)). As such, the court found that the complaint plausibly alleged that Plaintiff spoke as a citizen on a matter of public concern. Perez, 629 F. Supp. 3d at 1183.

Here, the Court finds the same. The fact that Plaintiff only "submitted a signed and sworn Affidavit to the Mayor of Bradenton, Gene Brown, about unlawful activities that Chief Bevan was engaging in," (Dkt. 14 at ¶ 20), does not mean Plaintiff

engaged in speech as an employee as opposed to having engaged in speech made by a citizen. Like Perez, Plaintiff voiced his concerns to the individual alleged to be responsible for investigating any malfeasance, misfeasance, or gross mismanagement by BPD, that is "Mayor Brown, . . . the City of Bradenton's Chief Executive Officer." (Id. at ¶ 21) To the extent that the City may contend Plaintiff should have voiced his concerns to the Office of Professional Standards ("OPS") within the BPD, that argument would fail. As alleged, the BPD is comprised of three divisions: Patrol Division, Patrol Support Division, and the Office of the Chief. (Id. at ¶ 12) The Office of the Chief oversees OPS. (Id. at ¶ 13) Thus, Plaintiff had no choice but to voice his concerns about Chief Bevan to the Mayor because Chief Bevan is the head of the Office of the Chief within BPD, which oversees OPS. (See id. at ¶¶ 11-13) Finally, as in Perez, Plaintiff does not claim he complained of the alleged misconduct of Chief Bevan and those in her command "to further his own private interests." See Perez, 629 F. Supp. 3d at 1183. As such, Plaintiff has plausibly alleged that he spoke as a citizen on a matter of public concern. See id.

As for the second requirement regarding Plaintiff's First Amendment claim, neither Plaintiff nor the City claims that Plaintiff's free speech had an impact on BPD's efficiency. (See generally, Dkts. 14, 17) And with respect to the third requirement, Plaintiff adequately alleges that his speech played a "substantial part" in the BPD's decision to terminate him. See McAlpin, 61 F.4th at 934. In McAlpin, the court affirmed the district court's order on summary judgment in which it found that

McAlpin, the Chief of Police, could not show that the Town Council's decision to terminate him was based on McAlpin's speech, rather than his "insubordinate actions." Id.

Here, at the motion-to-dismiss stage, the Court must accept Plaintiff's non-conclusory allegations as true. Plaintiff's allegations in this regard are sufficient. Plaintiff alleges that in August 2022, he submitted an Affidavit to the Mayor of Bradenton about unlawful activities engaged in by Chief Bevan. (Dkt. 14 at ¶ 20) Shortly afterward, "the Mayor called for an 'independent' investigation into the allegations against Chief Bevan." (Id. at ¶ 22) Then, on February 27, 2023, Plaintiff was notified that he had been placed under an Internal Affairs investigation, "the sole basis of which is the contents of the whistleblower protected Affidavit he made to the Mayor." (Id. at ¶ 27) Plaintiff claims that Chief Bevan "has declared she will get vengeance against those who submitted affidavits against her to the Mayor," (id. at ¶ 25), and that the Internal Affairs investigation began "a mere eleven days after the 'independent' investigation into the allegations against Bevan had concluded." (Id. at ¶ 28) Plaintiff states that "[f]ollowing [Plaintiff's] protected activity, Defendant has taken every available opportunity to retaliate against him, including but not limited to . . . terminat[ion] from employment," which occurred on March 28, 2023. (Id. at ¶¶ 24, 31) Plaintiff claims that he was "terminated in retaliation for making protected disclosures . . . for his First Amendment protected speech." (Id. at ¶ 32) These allegations are sufficient to show, at this stage of the case, that his speech played a

"substantial part" in the BPD's decision to terminate him. Cf. McAlpin, 61 F.4th at 934. Notably, while the City complains that Plaintiff lists a host of other retaliatory actions taken against him that purportedly fail to "come close to meeting the standard established in the Eleventh Circuit" for adverse actions, (see Dkt. 17 at 18; Dkt. 14 at ¶ 24), the City nevertheless concedes that Plaintiff has pled an adverse action taken against him, that is termination. (See Dkt. 17 at 13-19)

In sum, the Court finds that Plaintiff has adequately alleged the City retaliated against him for engaging in protected speech in violation of his First Amendment rights.

### ii. Municipal Liability

The next questions are whether Plaintiff has sufficiently pled that the City engaged in a custom, policy, or practice that constituted deliberate indifference to Plaintiff's First Amendment rights and whether that municipal custom, policy, or practice caused the violation of his First Amendment rights. See Hoffman, 2023 U.S. Dist. LEXIS 167976 at *13. A plaintiff seeking to impose liability on a governmental entity under § 1983 must identify a "municipal 'policy or custom' that caused the plaintiff's injury." Board of the County Comm'rs v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

"A plaintiff, like [Mahoney], has two methods by which to establish a [city's] policy: identify either (1) an officially promulgated [City] policy or (2) an unofficial custom or practice of the [City] shown through the repeated acts of a final policymaker

12

for the [City]." Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 694 (1978)). However, it is also "plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur v. City of Cincinatti, 475 U.S. 469, 480 (1986)). "Because a [City] rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs, and [Mahoney], must show that the [City] has a custom or practice of permitting it and that the [City's] custom or practice is the 'moving force [behind] the constitutional violation.'" See Grech, 335 F.3d at 1329 (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)).

"Under either avenue, a plaintiff (1) must show that the local governmental entity, here the [City], has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." Grech, 335 F.3d at 1329 (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, (1989)); Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996) (citing Pembaur, 475 U.S. at 489)). However, "identifying and proving that a final policymaker acted on behalf of a municipality is an evidentiary standard, and not a pleading requirement." Hoefling v. City of Miami, 811 F.3d 1271, 1280 (11th Cir. 2016).

13

Here, the Parties dispute whether Chief Bevan is a "final policymaker" for purposes of <u>Monell</u> liability. (<u>See</u> Dkt. 21 at 2-5; Dkt. 24 at 1-5) But at the motion-to-dismiss stage, that is not the proper inquiry. <u>See</u> <u>Hoefling</u>, 811 F.3d at 1280 ("Although [the plaintiff] may ultimately have to identify (and provide proof concerning) a single final policymaker in order to survive summary judgment or prevail at trial, <u>see,</u> <u>e.g.</u>, <u>Grech</u>, 335 F.3d at 1329, we do not think that he had to name that person in his complaint in order to survive a Rule 12(b)(6) motion. All he needed to do was allege a policy, practice, or custom of the City which caused the seizure and destruction of his sailboat. And that, as we detail below, he did.") Thus, as in <u>Hoefling</u>, Plaintiff need only allege "a policy, practice or custom of the City" that caused his constitutional violation in order to survive a motion to dismiss. <u>See</u> <u>id.</u>

Here, Plaintiff alleges that "[t]here exists a longstanding and widespread practice [of the Defendant City] which subjects it to liability for the actions of BPD and Bevan that constitutes a policy, custom or usage with the force of law, to wit: the City and its high-ranking officials are aware of and/or tacitly authorize and/or display deliberate indifference toward and/or tolerate and/or ignore Bevan's retaliatory conduct directed at those who speak out against her." (Dkt. 14 at ¶ 35) To support his contention, Plaintiff states that, after the PBA published the results of the survey, "BPD's *administration* began retaliating against officers they believed took part in the survey, calling them 'cowards' and going to great lengths to attempt to find out specifically which officers responded to the survey." (<u>Id.</u> at ¶ 17) (emphasis added)

14

Plaintiff further claims that the BPD's Internal Affairs investigation allowed Chief Bevan "to both act as the complainant and sit on Mahoney's command review board despite the fact that a clear conflict existed," (id. at ¶ 34), suggesting, at minimum, "a custom, [policy or practice] of prejudicial review exist[ing]" within the BPD. See Benjamin Pieper v. City of Bradenton, No. 8:23-cv-646-SDM-AEP, ECF No. 28 at 4 (M.D. Fla., filed Oct. 11, 2023). As Plaintiff notes, the command review board, on which Chief Bevan served, placed him on unpaid administrative leave, and, five days later, he was terminated from his position. (Dkt. 14 at ¶¶ 29-31)

These allegations, viewed in the light most favorable to Plaintiff, are not conclusory as the City contends. Cf. Perez, 629 F. Supp. 3d at 1184 (finding the allegation that "[t]he City has a history of retaliating against those who speak out about gross financial mismanagement/waste of public funds" was conclusory, factually unsupported, and thus, insufficient to plausibly allege a "custom or practice" of retaliation). Plaintiff has sufficiently pled that the City engaged in a custom, policy, or practice that constituted deliberate indifference to Plaintiff's First Amendment rights, and further that the City's custom, policy, or practice caused the violation of his First Amendment rights. See Hoffman, 2023 U.S. Dist. LEXIS 167976 at *13. Further development of the record in discovery may cause the Court to hold differently at summary judgment, but the Court declines to find in the City's favor at this stage of the case. The City's Motion to Dismiss Count I of the Amended Complaint is due to be **DENIED**.

### B. Mahoney Pleads Sufficient Facts to Establish a Violation of Florida's Public Whistleblower Act.

To state a claim under the Act, a plaintiff must allege that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there existed a causal connection between the two events. See King v. Bd. of Cnty. Comm'rs, No. 8:16-cv-2651-T-33TBM, 2017 U.S. Dist. LEXIS 41941 at *30 (M.D. Fla. Mar. 23, 2017) (citing Castro v. Sch. Bd. of Manatee Cty., Fla., 903 F. Supp. 2d 1290, 1302 (M.D. Fla. 2012)). The City contends Plaintiff's allegations fail to satisfy the first prong.

In order to determine whether a plaintiff has engaged in a statutorily protected Whistleblower activity, a plaintiff's disclosure must meet three requirements. First, the information revealed must include "[a]ny violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare" or "[a]ny act or suspected act of gross mismanagement, malfeasance, misfeasance, . . . or gross neglect of duty committed by an employee or agent of an agency or independent contractor." Fla. Stat. §§ 112.3187(5)(a), (b). Second, for disclosures concerning a local government entity, including a municipal entity such as the City, "the information must be disclosed to a chief executive officer as defined in s. 447.203(9) or other appropriate local official." Fla. Stat. § 112.3187(6). Third, the disclosure of a violation or suspected

violation must be made in a signed written complaint, if disclosed on the employee's own initiative. Fla. Stat. § 112.3187(7).

> i. **Whether The Affidavit Alleges A Violation or Suspected Violation of Law or an Act or a Suspected Act of Gross Mismanagement, Malfeasance, Misfeasance, or Gross Neglect of Duty**.

Contrary to the City's contentions, Plaintiff's Affidavit alleges acts or suspected acts of gross mismanagement, malfeasance, misfeasance, or gross neglect of duty. (See Dkt. 14-1 at 9-15) The City contends the Affidavit does not contain facts showing a violation of law that was carried out and "which create[d] and present[ed] a substantial and specific danger to the public's health, safety, or welfare" as required by Fla. Stat. § 112.3187(5)(a). (Dkt. 17 at 23) While the Affidavit may not state facts showing Chief Bevan and those in her command committed actual violations of law, it does contain facts demonstrating acts or suspected acts of "gross mismanagement, malfeasance, misfeasance, . . . or gross neglect of duty committed by an employee or agent of an agency." See Fla. Stat. § 112.3187(5)(b).

The Act defines "gross mismanagement" as "a continuous pattern of managerial abuses, wrongful or arbitrary and capricious actions, or fraudulent or criminal conduct which may have a substantial adverse economic impact." Fla. Stat. § 112.3187(3)(d). "Misfeasance" has been defined as the "improper doing of an act which a person might lawfully do," while "malfeasance" has been defined as "the

17

doing of an act which a person ought not do at all." See King, 2017 U.S. Dist. LEXIS 41941 at * 31-32 (citing Burden v. City of Opa Locka, No. 11-22018-CIV, 2012 U.S. Dist. LEXIS 144903, 2012 WL 4764592, at *10 (S.D. Fla. Oct. 7, 2012)). The Court highlights two incidents from Plaintiff's Affidavit that, if true, qualify as "gross mismanagement, malfeasance, misfeasance, . . . or gross neglect of duty committed by an employee or agent of an agency." See Fla. Stat. § 112.3187(5)(b)

In one incident, Plaintiff stated that he was assigned to investigate a cold case murder, and that he had identified a suspect whom he believed could identify the person or persons who murdered the victim. (See Dkt. 14-1 at 9) Plaintiff convened a meeting with Chief Bevan and others in her command to discuss the status of the investigation. (Id.) When Plaintiff informed those in attendance that the suspect refused to cooperate with the investigation, they began to discuss possible avenues by which to obtain his cooperation. (Id. at 10) Plaintiff claims the following occurred:

> 11. I advised that I believed the suspect might use drugs and suggested the possibility of a narcotics sting through which we could attempt to obtain his cooperation by way of a plea bargain.
>
> 12. At that point, Chief Bevan asked whether or not the suspect had a valid driver's license and suggested that "we crash into his car" and thereafter arrest him for driving on a suspended license.
>
> 13. Chief Bevan went on to state, "I had to do that when I was at St. Pete multiple times."
>
> 14. Chief Bevan went on to further suggest we repossess the individual's truck, get his power disconnected, and even have his children removed from his custody.

> 15. Chief Bevan commanded, "We need to make this guy's life hell until he cooperates."
>
> 16. At that point, Internal Affairs Detective Curulla interjected and suggested that we just "go get him and bring him in."
>
> 17. I was stunned that an Internal Affairs Detective was suggesting that we break the law.
>
> 18. I advised that the individual was recovering from surgery at the time and that the State Attorney's office ("SAO") had instructed me to stay away from the suspect.
>
> 19. I likewise informed those in attendance that I had presented an arrest warrant for the individual to the SAO, but my warrant request was denied and the SAO refused to file any charges against the individual.
>
> 20. As such, I advised Internal Affairs Detective Curulla that I could not arrest someone whom I knew that the state was not going to prosecute.
>
> 21. At that point, Internal Affairs Detective Curulla stated, "Well if he thinks he's under arrest, that's his problem."

(Id. at 10-11)

Although the suspect was never ultimately arrested, Plaintiff states this interaction shows misfeasance, if not malfeasance, on the part of Chief Bevan and others in her command. As noted previously, while the Court does not find that all the statements describe misfeasance or malfeasance, the Court does note that Chief Bevan's alleged statement that she purposefully crashed into suspects' cars in St. Petersburg "multiple times" in order to arrest those suspects for a different reason and her seemingly suggesting that practice should be employed in the instance at issue may

demonstrate "gross mismanagement, misfeasance, malfeasance, . . . or gross neglect of duty." See Fla. Stat. § 112.3187(5)(b).[2] Consequently, Plaintiff's Affidavit alleges a plausible act or a suspected act of gross mismanagement, malfeasance, misfeasance, or gross neglect of duty.

In another incident, Plaintiff stated that Chief Bevan hired an individual named Christopher Herron in January 2020, who was a "longtime associate of hers from her time with the St. Petersburg Police Department." (Dkt. 14-1 at 13) Plaintiff claimed that Herron became physically violent with him and others on multiple occasions and that he was forced to defend himself. (Id.) Plaintiff stated that "[a]ny time we would challenge his insubordination or his violent and aggressive behaviors, Herron would threaten to use his friendship with Chief Bevan as a defense to our complaints." (Id.) Notably, Herron would state, "Do I need to tell Melanie? You know she's my best friend." (Id.)

Plaintiff also claimed that "unbeknownst to [him], Herron was not sworn as a BPD officer," but he "[n]onetheless . . . took law enforcement actions on behalf of BPD." (Id.) According to Plaintiff, "Chief Bevan did not inform [him] that Mr. Herron was not sworn to serve with BPD, and she allowed Mr. Herron to conduct himself as if he were a sworn BPD officer." (Id.) In his Affidavit, Plaintiff relayed one encounter

---

[2] Further, to the extent any suspects or other citizens may have been injured and continue to suffer any injuries from these alleged car crashes, Chief Bevan's actions may also qualify as a "violation or suspected violation of any federal, state, or local law, rule, or regulation . . . which creates and presents a substantial and specific danger to the public's health, safety, or welfare." Fla. Stat. § 112.3187(5)(a).

in which Mr. Herron conducted a traffic stop contrary to a sergeant's order and despite the BPD having "an agency-wide directive against conducting traffic stops" at the time, "which [Plaintiff] believe[d] was related to the COVID-19 pandemic and other staffing concerns." (Id. at 14) Plaintiff stated that he was "concerned that [Herron's] exercise of arrest powers under the authority of BPD" violated Florida law, and, further, "that [Herron] illegally seized and arrested citizens of Bradenton in violation of the Fourth Amendment of the Constitution." (Id.) Plaintiff claimed "[i]t was obvious that Mr. Herron was not concerned about violating BPD policies or violating direct orders due to his relationship with Chief Bevan" and that Chief Bevan's "enabling of Mr. Herron's repeated violent behavior . . . put all of the citizens in Bradenton at risk, including any and all BPD officers." (Id. at 14-15)

In the motion to dismiss, the City contends that Plaintiff merely speculates that Chief Bevan must have known that Herron was allegedly wrongfully exercising police powers and that Herron was, in fact, sworn in as a reserve officer prior to the incidents of his use of police powers alleged by Plaintiff. (Dkt. 17 at 23-24) The City also argues that there is no proof that Chief Bevan would have known about Officer Herron's alleged physical violence towards Plaintiff and other police officers and that Mahoney's allegations, in short, are mere speculation. (Id. at 24)

Even if Plaintiff's allegations were based on speculation, the Whistleblower Act, by its text, protects this content. The Act protects information that reveals "[a]ny act or *suspected act* of gross mismanagement, malfeasance, misfeasance, . . . or gross neglect

of duty." Fla. Stat. § 112.3187(5)(b) (emphasis added). See Irven v. Dep't of Health & Rehabilitative Servs., 790 So. 2d 403, 406 (Fla. 2001) (noting that the Act is broadly worded to include "suspected act[s]," which is consistent with "the intent of the Legislature to prevent agencies . . . from taking retaliatory action against any person who discloses information to an appropriate agency alleging improper use of governmental office . . . or any other abuse [or gross neglect of duty] on the part of an agency, public officer, or employee." Fla. Stat. § 112.3187(2)). At a minimum, Plaintiff's assertions qualify as suspected acts of gross mismanagement, malfeasance, misfeasance, or gross neglect of duty committed by Chief Bevan and her command staff. Cf. McAlpin v. Town of Sneads, 61 F.4th 916, 926 (11th Cir. 2023) (affirming the district court's order on summary judgment that the Chief of Police's "whistleblower" letter to the Town Council was not protected under the Act "because it did not identify the substance of the suspected criminal conduct . . . [and] there [was] no evidence that the Town Council knew what conduct the letter was referring to.") Further, Mahoney concludes his Affidavit by stating that he "felt motivated to share [his] experience on the blatant abuse of power demonstrated by Chief Melanie Bevan and her command staff." (Dkt. 14-1 at 15) The Court, therefore, finds that the Affidavit alleges plausible acts or suspected acts of gross mismanagement, malfeasance, misfeasance, or gross neglect of duty committed by Chief Bevan and those in her command.

### ii. Mahoney's Affidavit was properly disclosed to a "Chief Executive Officer," as defined under Florida law, and in a protected manner.

As for the last two requirements, the Court finds that the Affidavit was disclosed to a chief executive officer, pursuant to Fla. Stat. § 112.3187(6), and that the disclosure was made in a signed written complaint on Plaintiff's own initiative. See Fla. Stat. § 112.3187(7)

The City contends that because Plaintiff disclosed the Affidavit to the PBA, a third party, rather than directly to Mayor Brown, Plaintiff failed to show that he disclosed information to a "[c]hief executive officer . . . or other appropriate local official" as required by Fla. Stat. § 112.3187(6). (Dkt. 17 at 20-21) Further, the City argues that the information was not disclosed in a protected manner because Plaintiff did not "disclose information on [his] own initiative in a written and signed complaint" as required by Fla. Stat. § 112.3187(7)(a). (Id. at 21-22) The City states that the Act requires Plaintiff to show that "the complaint was his and was submitted on his own initiative," but "[t]he letter makes clear that the letter was the PBA's complaint on its own initiative." (Id. at 22) Plaintiff does not dispute that he sent the Affidavit to the PBA but claims that "he drafted and submitted his [Affidavit] with the express purpose of it being submitted to the Mayor on his behalf by the union." (Dkt. 21 at 10) The Court finds that Plaintiff has satisfied the statutory requirements of disclosure

23

because the Affidavit, written and signed by Plaintiff, was disclosed to the Mayor, who was the intended recipient of the information.

First, the Court notes that the only case the City relies on for support of its arguments is readily distinguishable on its facts. In <u>Crouch v. Public Service Commission</u>, 913 So. 2d 111 (Fla. 1st DCA 2005), the court found that appellant Crouch was not entitled to whistleblower protection because he made only verbal complaints to his supervisory officials. The court first reasoned that "under the plain language of the statute, the complaints had to be in writing." <u>Id.</u> Further, the court found that Crouch's "complaints to the supervisory officials, who then told the designated agency inspector general about the complaints on their own initiative" could not be construed as a protected disclosure under the Act. <u>Id.</u> at 112. The court stated: "Crouch did not ask his supervisors to submit the complaints on his behalf, and no promise was made by the supervisors that they would do so." <u>Id.</u>

Here, by contrast, Plaintiff disclosed protected information in a written and signed Affidavit. <u>Compare</u> <u>Crouch</u>, 913 So.2d at 111 <u>with</u> (Dkt. 14-1 at 9-15) Plaintiff alleges he submitted the Affidavit "to the Mayor of Bradenton, Gene Brown, about unlawful activities that Chief Bevan was engaging in" and that "Mayor Brown is the City of Bradenton's Chief Executive Officer." (Dkt. 14 at ¶¶ 20-21) Plaintiff states that he "reported and disclosed violations of rules, regulations, and laws to a person who had the authority to investigate, police, manage and otherwise remedy the violations." (<u>Id.</u> at ¶ 51) Unlike the appellant Crouch, Plaintiff expected the PBA to disclose his

Affidavit, along with the other officers' affidavits, to Mayor Brown on his behalf. Compare Crouch, 913 So.2d at 112 with (Dkt. 14-1 at 1-3, 9-15) The PBA's letter to Mayor Brown makes that clear. (See Dkt. 14-1 at 2 ("The information that Officer Kalchbrenner provided to the PBA, when combined with the affidavits of Joe Kelly, Patrick Mahoney, and Christopher Capdarest, as attached hereto, reveal that Chief Bevan has implemented and fostered within the BPD, a culture of abuse, lawlessness, and unlawful retaliation. These current and former officers are putting their careers on the line to attempt to shed light on the serious issues that are plaguing the agency."))

Although the PBA stated that it, as opposed to the officers, "was bringing these complaints" to Mayor Brown, (Dkt. 14-1 at 2), the PBA first noted that it was doing so because "[t]he officers have repeatedly attempted to get [Mayor Brown's] attention to show the ongoing problems at the Agency, but so far have been met with repeated disappointment as none of the issues are being addressed." (Id.) As such, when the PBA's letter is read in context, the Court finds that it is clear Plaintiff disclosed information to a "[c]hief executive officer" as required by Fla. Stat. § 112.3187(6) "on [his] own initiative in a written and signed complaint" as required by Fla. Stat. § 112.3187(7).[3]

---

[3] The Court notes that there is no inconsistency between the Court's finding in Count I that Plaintiff raised allegations of misconduct to the Mayor as a citizen for purposes of the First Amendment, and the Court's finding in Count II that Plaintiff disclosed the Affidavit to the Mayor in compliance with the Whistleblower Act. Plaintiff disclosed his allegations of misconduct, as a citizen, to the individual responsible for remedying the purported violations, see Perez, 629 F. Supp. 3d at 1183, while also complying with the Whistleblower Act by disclosing the Affidavit to the Mayor as the chief executive officer. As explained above, that the Affidavit was not provided to the general public does not mean Plaintiff did not speak as a citizen for purposes of the First Amendment. See id.

The City's argument is also incompatible with the intent of the Act, as recognized by the Supreme Court of Florida. See Irven, 790 So. 2d at 405 (citing Martin County v. Edenfield, 609 So. 2d 27, 29 (Fla. 1992) ("[W]e believe it clear that the [public employee] Whistle-Blower's Act is a remedial statute designed to encourage the elimination of public corruption by protecting public employees who 'blow the whistle.' As a remedial act, the statute should be construed liberally in favor of granting access to the remedy.") If the Court were to accept the City's argument, Plaintiff would be barred from relief even though Plaintiff submitted a written and signed complaint, (see Dkt. 14 at ¶ 20), Plaintiff's intended recipient, Mayor Brown, in fact received and acted upon the protected information, (see id. at ¶ 22), and Plaintiff was allegedly retaliated against for engaging in this protected activity. (See id. at ¶ 32) The Court finds that the "remedial" nature of the Act strongly counsels against accepting the City's narrow construction of the statute in this instance.

In sum, Plaintiff has adequately alleged a claim under Florida's Public Whistleblower's Act. See Fla. Stat. § 112.3187; King, 2017 U.S. Dist. LEXIS 41941 at *30. First, as explained above, Plaintiff has plausibly alleged that he engaged in a statutorily protected activity. See Fla. Stat. §§ 112.3187(5), (6), (7). Second, Plaintiff has plausibly alleged that he suffered an adverse employment action. See King, 2017 U.S. Dist. LEXIS 41941 at *30; (Dkt. 14 at ¶ 31 ("On March 23, 2023, Mahoney was notified that a pre-disciplinary hearing was scheduled for March 28, 2023, where it was determined that Mahoney would be terminated from employment.")) Finally,

Plaintiff has plausibly alleged there existed a causal connection between the two events. See King, 2017 U.S. Dist. LEXIS 41941 at *30; (Dkt. 14 at ¶ 52 ("After providing information, as well as reporting these matters . . . , Plaintiff was the victim of retaliatory action up to and including his termination.")) Notably, the City does not dispute Plaintiff's allegations concerning the last two prongs for stating a claim under the Act. (See Dkts. 17, 24) The City's motion to dismiss Count II of Plaintiff's Amended Complaint is due to be **DENIED**.

### IV.    CONCLUSION

Accordingly, it is hereby **ORDERED** as follows:

1. Defendant City of Bradenton's Motion to Dismiss Amended Complaint, (Dkt. 17), is **DENIED**.

2. The City shall have **TWENTY-ONE (21) DAYS** from the date of this Order within which to file an Answer to the Amended Complaint.

**DONE** and **ORDERED** in Tampa, Florida, this 20th day of March 2024.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**[*]

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person

---

[*] Signed by Judge Tom Barber to expedite the resolution of this motion. This case remains assigned to Judge Mary S. Scriven.